MEMORANDUM OF DECISION
This is an action for Termination of parental rights brought by the Commissioner of the Department of Children and Families ("DCF"). The respondents, Kristen S. and Jeffrey H., are the biological parents of Ashley, Jason and Nicholas.
PROCEDURAL BACKGROUND
On March 24, 1997, DCF filed neglect petitions alleging that Ashley, Jason and Nicholas were neglected in that the children were being denied proper care and attention, physically, educationally, emotionally or morally and that the children were being permitted to live under conditions, circumstances or associations injurious to their well being. Conn. Gen. Stat.
§ 46b-120 (8)(B)(C).
On March 24, 1997, the court granted an order of temporary custody with regard to all three of the children.
On April 27, 1998, the court adjudicated the children neglected and committed them to the care and custody of the Commissioner of the Department of Children and Families.
On March 2, 1999, DCF filed a petition for termination of parental rights of Kristen S. and Jeffrey H. With regard to Kristen S., DCF alleged that the children had been found a prior proceeding to have been neglected and that the mother had failed to achieve such a degree of rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the children, she could assume a responsible position in their lives. Conn. Gen. Stat. § 17a-112 (c)(3)(B).
With regard to Jeffrey H., the petition alleged that he has abandoned the children in the sense that he has failed to maintain a reasonable degree of interest, concern, or responsibility as to the welfare of the children. Conn. Gen.Stat. § 17a-112 (c)(3)(A).
On April 27, 1999, Jeffrey H. voluntarily consented to termination of his rights and the court entered an order terminating his parental rights with regard to all three children.
FACTUAL FINDINGS
CT Page 2267
The court makes the following findings by clear and convincing evidence.
The children were originally committed to DCF because the condition of Kristen's home was unsafe for the children, and Kristen lacked the necessary parenting skills to feed, bathe and supervise her children.
DCF offered Kristen numerous services to aid with reunification. Specifically, she was provided Individual therapy at North Central Counseling and Support Connections (now North Central Counseling Services), Psychiatric Services, NCCS Young Parents' Support Group, South Windsor Human Services parenting classes, Literacy Volunteers America GED preparation, Town of Enfield Board of Education GED preparation classes, Town of Enfield job placement and training program, New Britain YMCA Playgroup, Dialectical Behavior Therapy Group, NCCS Parenting With Care, Psycho Educational Group, Psychological, Parenting and Psychiatric Evaluations, a Diagnostic Cognitive Processing and Educational Achievement Evaluation, a Supervised Visitation Program at NCCS, which included hands-on parenting education, supervised visitation at AMPS, Inc., which included individualized parenting instruction, and supervised visitation by DCF.[2]
Accordingly, Kristen was offered parenting classes and programs, job training and job placement programs, numerous psychological and psychiatric evaluations and supervised visitation with parent education components.
Kristen was evaluated by many psychologists and psychiatrists including Dr. Robert Meier, Dr. Stephen Greenspan, Dr. Kathleen Bradley, Dr. Marvin Zelman and Dr. Kathleen Bonal. Based on the evaluations, DCF repeatedly attempted to determine what Kristen's mental health issues were and how best to address her problems.
In 1997, Dr. Meier performed an individual psychological evaluation of Kristen and an interactional evaluation with Kristen and her children. He found that Kristen had trouble setting limits for all the children. Her parenting style seemed to have little sensitivity to the children's developmental level or feelings and her interventions were inconsistent, not well timed and not adequately specific or concrete. As will be discussed more fully below, DCF attempted to address these findings by providing ongoing parenting instruction to Kristen CT Page 2268 during her multiple visits on a weekly basis with the children.
Dr. Zelman conducted a psychiatric evaluation of Kristen in March of 1998, which consisted of separate interviews with Kristen and the children and a family session with Kristen and her three children together. In June of 1998, Dr. Zelman made a provisional diagnosis for Kristen of mixed personality disorder and learning disability and recommended that she engage in psychological testing to help establish a specific cognitive diagnosis. The psychological testing that Dr. Zelman recommended was subsequently performed by the Institute of Living. After reviewing the test results, Dr. Zelman testified at trial that these results confirmed his diagnosis of personality disorder and learning disability. Dr. Zelman also testified that mother's mental health problems reduce her capacity to parent because she has very limited tolerance, is easily angered, acts out on her impulses and conducts herself improperly. By way of example, he stated that while he was conducting a court sanctioned evaluation of the children, Kristen made approximately twenty harassing calls to his office during the evaluation.
He described the interactional session as chaotic. Kristen was constantly feeding the children during the session and food was all over the floor. One of the children's glass fell on the floor and one of the other children fell on his face and then wandered around unattended. Finally, Kristen became so exhausted that she began to hyperventilate. She then sat down and did not attend to or supervise her children. Dr. Zelman testified that based on the interactional session that he observed, it would be frightful to think of this mother home alone with these three children.
Dr. Zelman recommended that Kristen engage in psychotherapy which is a service that DCF provided to Kristen through NCCS.
In July of 1998, DCF asked Dr. Kathleen Bradley to perform a Diagnostic Cognitive Processing Educational Achievement Evaluation of Kristen. The purpose of this evaluation was to assess the cognitive abilities of Kristen and help determine the best methods to assist her in learning parenting skills. All of the parties agreed that she had problems in-taking data and processing information. After this evaluation was completed, DCF met with respondent and her counsel to identify goals and reassess proper services for Kristen. Goals were set at this meeting and Dr. Bradley's recommendations were subsequently sent to Ann Tuller at AMPS, who incorporated the recommendations into CT Page 2269 AMPS parent training with Kristen.
It is clear from the foregoing that there was an ongoing effort by DCF to assess mother's mental health issues and to attempt to address those issues by providing appropriate services.[3]
In addition to the numerous evaluations that were performed in order to identify proper services for Kristen, DCF also arranged for her to engage in individual and group therapy. From April of 1997 through October of 1998, Kristen engaged in therapy with Joan Prior from NCCS. At the time of Kristen's discharge from this program, Ms. Prior described her as depressed, anxious, lacking structure, engaging in poor self-care, and showing disregard for harmful consequences. She recommended that mother engage in a Dialectical Behavioral Therapy ("D.B.T.") group and stated that she "needs to manage emotions, interpersonal skills, daily living skills, and . . . adulthood." She also found that there had only been slight progress during the time that she worked with Kristen.
Kristen began attending the D. B. T. group therapy at NCCS in November of 1998. In the spring of 1999, she also began individual therapy with Susan Fitzpatrick, another therapist at NCCS. Mrs. Fitzpatrick testified that when she began seeing Kristen she found her to be impulsive and depressed and diagnosed her with a mood disorder and attention deficit disorder. She also testified that Kristen's medications were changed in June of 1999 to include Lithium and since then she has observed gradual progress and more effective functioning by Kristen.
To aid with reunification, DCF also offered Kristen multiple visits on a weekly basis with her children. Specifically, between August of 1997 and January of 1998, Kristen attended a YMCA play group with Jason alone where she was able to observe two teachers and model their behavior. Between April, 1997 and July, 1997, Kristen visited with Nicholas alone in the foster home he was placed in. From August, 1997, through June of 1998, Kristen was also able to visit with Nicholas and Ashley once a week under the supervision of DCF. She was provided feedback during these visits by the supervising DCF worker. Between November of 1997 and September of 1998, Kristen was also able to visit with all three of the children together on a weekly basis under the supervision of Penny Lemery from NCCS. Ms. Lemery provided Kristen with one-on-one parenting instruction during the visits with the children and also provided her with feedback after the visits. After CT Page 2270 Kristen asked that the supervised visitation with Penny Lemery cease because Kristen perceived there was a personality conflict, she was offered supervised visitation, with a parent education component, at AMPS between September of 1998 and March of 1999. During the AMPS visits, staff continued to work with Kristen to teach her proper parenting techniques.
Despite the enormous amount of resources that were utilized to provide Kristen with hands-on parenting education and instruction, mother's ability to safely parent the children, if anything, deteriorated over time.[4]
Penny Lemery testified that issues regarding mother's ability to parent were ongoing throughout the period of time that she supervised visitation. Kristen had difficulty understanding the children's level of development, she was inconsistent, she needed to be told to get off the couch to play with the children, she brought inappropriate food, and she set inconsistent boundaries.
The DCF workers who supervised other visits also testified that mother would sit on the couch and tune the children out. They observed a lack of understanding by mother of the children's needs, a lack of supervision and inconsistent behavior in response to the children's conduct. Kristen also brought food that was unsafe for Nicholas. The DCF workers testified that the visits were chaotic and Kristen appeared overwhelmed in trying to care for the children.
When Kristen was referred to AMPS in September of 1998, it was apparent that she could not adequately take care of her children during a one hour visit much less parent the children full time. AMPS found that the children were not bonded with their mother, that Kristen engaged in role reversal with the children, that she set inconsistent limits, that she was extremely unorganized, that she treated the children differently, that she fed the children inappropriate food, and that she engaged in strange behavior in front of them. While Kristen was repeatedly provided with suggestions and techniques, consistent with recommendations made by Dr. Bradley to help her in parenting the children, she did not assimilate these suggestions. Things deteriorated to the point where AMPS personnel was forced to shadow Kristen around the room as she visited with the children and staff had to intervene in thirteen out of twenty-three visits to address safety issues.
Beginning in February of 1999, AMPS offered Kristen an CT Page 2271 additional half hour per visit in which to provide her more feedback without the children present. Kristen declined this offer.
While AMPS had initially recommended that visitation occur with one child only, Ann Tuller, the President of AMPS, testified that early on she realized that this would not have made any difference in mother's ability to parent the children. Additionally, Kristen had specifically requested that the children be together during the visits.
AMPS recommended in March of 1999 that visitation cease between Kristen and her children because of her problems parenting the children and the detrimental effect that the visits were having on the children. Despite all of the parenting services that were provided by DCF, mother's ability to parent the children had not improved.
Kristen's view of the parenting instruction provided by DCF, Penny Lemery and AMPS is consistent with her inability to receive constructive criticism, learn from her mistakes and accept responsibility. Kristen testified during the trial that she felt that the DCF worker was constantly" on her back", Penny Lemery's services and instructions were not helpful and the supervised visitation with parenting education at AMPS was a "holy nightmare" and that Ann Tuller "was constantly on her butt."
THE CHILDREN
Ashley is now six years old. She has spent almost half her life in foster care and has been placed in the same foster home since April 3, 1997. Soon after Ashley was removed from her mother's home, she was given a psychiatric evaluation due to concerns regarding her behavior. At the time, she was forty-two months old. She was diagnosed with Reactive Attachment Disorder. She was also evaluated as functioning significantly below her age "level with an overall developmental level of a sixteen month old child.
Ashley's foster mother testified that when Ashley was placed with her at three and a half years old, Ashley did not use any eating utensils, did not know how to chew, "preferred to drink from a bottle, was not toilet trained, was drooling, and did not know how to play. She was afraid of leaves on trees, animals, and going outside. CT Page 2272
While Ashley has made tremendous progress since being placed at this home, she remains hyperactive. She has been diagnosed as educably mentally retarded and requires special education services. She engages in speech and occupational therapy and needs very concrete direction and structure. Ashley's foster mother testified eloquently about her love and commitment to Ashley. She has decided, however, that she cannot adopt Ashley given her age. She does plan, however, to remain a "grandmother" to Ashley and help with any transition to a permanent home. A family has been identified as a potential adoptive home for Ashley, and the family is in the process of deciding whether or not they wish to have Ashley placed with them.
Ashley views her foster mother as her psychological parent. She did not want to go to the last few visits that were scheduled with her biological mother.
Jason will be five on March 15, 2000. He is an extremely active child and is emotionally fragile. He requires constant assurance that he will be taken care of and that he continue to live with his foster parents.
Jason's therapist testified that Jason has made progress and is doing very well since being placed in a pre-adoptive home in May of 1999. Jason remains, however, more insecure and anxious than most four year olds and his therapist testified that it would be very detrimental to his psychological development to be moved from this family. She also "testified that Jason's caretaker needs to have a great deal of impulse control with Jason and must have significant insight to not allow Jason to "push buttons." She also testified that Jason's bond with his mother is comparable to that of a distant relative. Jason's foster parents wish to adopt him and Jason has stated that he wants to have the same last name as his foster parents.
Nicholas will be three years old on March 20, 2000. He has spent his entire life in foster care. He is developmentally delayed and hyperactive. He was placed in a legal risk pre-adoptive home in October of 1999 and has adjusted well to this placement. Nicholas' foster mother testified that they are committed to Nicholas and wish to adopt him.
ADJUDICATION
A. Reunification
CT Page 2273
In order to terminate parental rights, DCF must initially show by clear and convincing evidence that DCF "has made reasonable efforts to locate the parent and to reunify the child with the parent, unless the court finds in this proceeding that the parent is unable or "unwilling to benefit from reunification efforts."Conn. Gen. Stat. § 17a-112 (c)(1). The court finds by clear and convincing evidence that DCF made reasonable efforts to reunify Kristen with her children. She was continuously being professionally evaluated to help assess what services would help her with reunification. The Department took mother's mental condition into consideration in determining what services to provide in its efforts to reunify the family. See In re Antony,54 Conn. App. 463, 473 fn. 9 (1999). She was provided with individual and group counseling to help her with her mental health issues. Kristen was also provided with multiple visitation periods with the children on a weekly basis. As part of this visitation, she was provided with professional ongoing assistance in parenting techniques. She was also referred to multiple parenting classes. Finally. DCF assisted Kristen in looking for housing and employment.
B. Statutory Grounds
To prevail in a non-consensual termination of parental rights case, DCF must also prove by clear and convincing evidence that one of several statutory grounds for termination exist. See In reMichael B., 49 Conn. App. 510, 512 (1998); Conn. Gen. Stat. §17a-112 (c)(3). In this adjudicatory phase, the court is limited to events preceding the filing of the latest amendment. See Practice Book Section 33-3(a). The relevant date in this case is March 2, 1999.
FAILURE TO REHABILITATE
A statutory ground for termination arises when "the parent of a child who (1) has been found by the Superior Court to have been neglected or uncared for in a prior proceeding . . . has failed to achieve such degree of personal rehabilitation as would "encourage the belief that within a reasonable time, considering the age and needs of the child, such parent could assume a responsible position in the life of the child." Conn. Gen. Stat. § 17a-112 (c)(3)(B). The statute requires the court to analyze the parents' rehabilitative status "as it relates to the needs of the particular child and further, that such CT Page 2274 rehabilitation must be foreseeable within a reasonable time." Inre Luis C., 210 Conn., 157, 167 (1989).
No dispute exists that the court has previously found the children to have been "neglected" thus satisfying a statutory pre-requisite. The rest of the statute requires the court to find whether the facts "encourage the belief that within a reasonable time, considering the age and needs of the child, such parent could assume a responsible position in the life of the child."Conn. Gen. Stat. § 17a-112 (c)(3)(B).
With regard to Kristen, the court finds by clear and convincing evidence that she has failed to rehabilitate within the meaning of Conn. Gen. Stat § 17a-112 (c)(3)(B). After the children were taken away from Kristen in March of 1997, she was offered multiple services and referrals as enumerated above. Kristen participated in the psychological and psychiatric evaluations that were scheduled for her and she regularly visited with her children. She also engaged in group and individual therapy. The issue, however, is not attendance at these services, but instead, whether, as a result of participating in these services, she can assume a responsible position in the lives of the children within a reasonable time. As of the relevant adjudicatory date of March 2, 1999, Kristen had not benefitted [benefited] from the services that were provided to her and had demonstrated no progress in her ability to be able to parent the children within a reasonable time.
While the Americans with Disabilities Act was not squarely raised as a defense to the termination proceeding, Kristen's counsel made numerous references to mother's disabilities throughout the trial. The court, therefore, notes that it is no defense to a claim of failure to rehabilitate that a parent, because of a physical or mental disability, may be incapable of rehabilitating. In re Juvenile Appeal (83-bc), 189 Conn. 66,77-79 (1983). Although a parent's status as a person with a physical or mental disability cannot legally be the basis for terminating her parenting rights, termination may be warranted when the disability manifests itself in conduct demonstrative of an inability to care for her children." In re Nicolina T.,9 Conn. App. 598, 607 (1987). The appellate court has recently held that the ADA is not a defense to a termination of parental rights proceeding. In re Antony B., 54 Conn. App. 473.
Given the services that were provided to Kristen and her failure to assimilate these services, the court finds by clear CT Page 2275 and convincing evidence that Kristen has failed to achieve such a degree of personal rehabilitation as would encourage the belief that within a reasonable time she could assume a responsible position in the lives of the children.
MANDATORY FINDINGS
With respect to the mandatory factual findings required byConn. Gen. Stat. § 17a-112 (d), except in the case where termination is based on consent;
1. The timely nature and extent of services offered, provided and made available to the parent and child by an agency to facilitate the reunion of the child with the parent.
DCF referred Kristen to numerous programs and made multiple assessments to help address her parenting deficiencies. These services were highly relevant to the needs of Kristen and were offered in a timely manner.
2. Whether DCF has made reasonable efforts to reunite the family pursuant to the federal Adoption Assistance and Child Welfare Act of 1980. The court finds that DCF offered Kristen appropriate and timely services and guidance, and more than sufficient time to permit family reunification.
3. The terms of any applicable court order entered into and agreed to by any individual or agency and the parent, and the extent to which all parties have fulfilled their obligations under such order.
Mother was given expectations on April 3, 1997 and June 4, 1998. As detailed above, DCF met its obligation to provide assistance to Kristen. While Kristen attended these programs and counseling, she did not make any progress in learning how to be a competent parent.
4. The feelings and emotional ties of the children with respect to their parents, any guardian and any person who has exercised physical care, custody or control of the children for at least one year and with whom the children have developed significant emotional ties.
All of the children are bonded and have significant emotional ties with their foster families. Jason does not speak about his CT Page 2276 mother and views her as a distant relative. Nicholas has not bonded with his mother. Ashley does not speak about her biological mother and views her foster mother as her psychological parent.
5. Ages of the children: Ashley is six and one-half years old. Jason is going to be five years old on March 1, 2000. Nicholas is going to be three on March 20, 2000.
6. The efforts the parent has made to adjust her circumstances or conditions to make it in the best interest of the children to return them to her home in the foreseeable future, including, but not limited to, (A) the extent to which the parent has maintained contact with the child as part of an effort to reunite the child with the parent provided the court may give weight to incidental visitations, communications or contributions, and (B) the maintenance of regular contact or communication with the guardian or other custodian of the child.
Kristen has made significant efforts to adjust her circumstances or conditions to facilitate reunification by engaging in numerous services and visitation with the children. However, she has not benefitted [benefited] from these services.
7. The extent to which a parent has been prevented from maintaining a relationship with the child by the unreasonable act or conduct of the other parent of the child or the unreasonable act of any other person, or by economic circumstances of a parent.
Kristen did not face unreasonable interference from anyone.
DISPOSITION
In the dispositional phase of a termination case, the court must consider whether DCF has proven by clear and convincing evidence that "termination is in the best interest of the child."Conn. Gen. Stat. § 17a-112 (c)(2). The court can consider all events occurring "through the close of the dispositional hearing. Practice Book Section 33-5.
Despite extraordinary efforts by DCF to reunify this family, Kristen has never demonstrated an ability to parent these children. Visitation between Kristen and her children ultimately ceased in March of 1999 because of its detrimental impact on CT Page 2277 Ashley. Jason and Nicholas. While there was testimony that Kristen's individual mental state has improved since she started taking Lithium in June of 1999, it is clear to the court that she has not reached the point where she could assume a responsible position in the lives of the children.
On the first day of trial, mother engaged in several outbursts despite warnings by the court that her behavior could be considered by the court in reaching its decision. When she testified later in the trial, she stated that she had not taken her medication on the first day of trial to show everyone what happens when she fails to do so. Despite testimony regarding mother's gradual progress since June of 1999, this lapse in judgment calls into serious question the extent to which there has been any significant progress. Additionally, Kristen's therapist conceded that the issues that Kristen had been working on over the past six months were individual issues and that no parenting issues have been identified as treatment goals.
Ashley, Jason and Nicholas are closely bonded with their foster parents who have provided them with loving and structured home environments. Ashley, in particular, is desperately in need of a highly structured, consistent environment which her mother can not provide even in a one hour visit. Nicholas has been in foster care his entire life and Jason is an insecure child who has been able to articulate his desire to remain with and have the same last name as his foster family.
There is no question that Kristen loves her children and wants them back. A parent's "love and biological connection, however, is simply not enough. DCF has demonstrated by clear and convincing evidence that Kristen cannot be a competent parent to these children because she cannot provide them a nurturing, safe and structured environment.
Based upon all of the foregoing findings, the court determines that it is in the children's best interests for a termination of parental rights to enter with respect to the mother, Kristen S., and accordingly, a termination of her parental rights is ordered. It is further ordered that the Commissioner of DCF be appointed as statutory parent for these children for the purpose of securing adoptive homes. The Commissioner shall file with this court no later than sixty (60) days following the date of judgment, a written report of efforts to effect such permanent placement, and file further reports as are required by state and CT Page 2278 federal law.
Chase T. Rogers Judge Of The Superior Court